NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251159-U

NO. 4-25-1159

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* E.L., a Minor, | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | McLean County |
|     v. | ) | No. 23JA80 |
| Brice L., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's findings that respondent was unfit and that termination of his parental rights was in his child's best interest were not against the manifest weight of the evidence.

¶ 2     The State filed a petition seeking to terminate respondent Brice L.'s parental rights as to his daughter E.L., a minor (born in 2023). The trial court found respondent to be unfit and that termination was in E.L.'s best interest, so it granted the petition and terminated his rights. On appeal, respondent argues that the fitness and the best-interest findings were against the manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4                              A. Initial Proceedings

¶ 5     In August 2023, the State filed a petition for adjudication of wardship alleging that E.L. was "living in an environment injurious to her welfare" pursuant to section 2-3(1)(b) of the

Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) for numerous reasons pertaining to domestic violence, anger management, alcohol and/or substance abuse, and mental health concerns. During the shelter-care hearing, E.L.'s biological parents—respondent and Daisha G.—admitted to probable cause, and the trial court granted temporary custody of E.L. to the Illinois Department of Children and Family Services (DCFS). The State later supplemented the petition to allege that E.L. was a newborn infant with barbiturates in her system which were not administered to her or her mother as part of medical treatment.

¶ 6        On January 18, 2024, Daisha admitted the allegation that E.L. lived in an environment injurious to her welfare, as shown by a pending case involving Daisha's other child. The trial court adjudicated E.L. to be a neglected minor as defined by section 2-3(1)(b), reasoning that "[Daisha] has yet to attain a fitness finding [and] has been found to not be making reasonable progress/substantial progress toward return home of her 2 prior-born children." The remaining allegations in the petition and supplemental petition were dismissed.

¶ 7        In March 2024, the trial court held a dispositional hearing, during which E.L. was made a ward of the court. She was to remain in DCFS's custody, with a goal to return home in 12 months. A plan for necessary services was established. Thereafter, the court held numerous permanency review hearings to track respondent's reasonable efforts to regain custody of E.L.

¶ 8                        B. Petition for Termination

¶ 9        In March 2025, the State filed the petition to terminate parental rights, alleging that respondent

> "is an unfit person under 750 ILCS 50/1 (D)(i), (m)(ii), and (p) 2017, and his parental rights should be terminated for reasons that:
>
> (a)  He is depraved (D)(i).

(b) He has failed to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected, abused and/or dependent minor under Section 2-3 and/or 2-4 of the Juvenile Court Act of 1987, specifically the time frame(s) running from February 1, 2024 through November 1, 2024 (D)(m)(ii).

(c) He has an inability to discharge parental responsibilities supported by competent evidence from a psychiatric, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or an intellectual disability as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of the Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period (D)(p)."

¶ 10 The petition also brought allegations of unfitness against Daisha, who filed a separate appeal (*In re* E.L., No 4-25-1123) from the termination of parental rights. The facts pertaining to only her case need not be delineated here.

¶ 11 C. Fitness Hearing

¶ 12 The fitness hearing occurred over the course of two days in 2025, one in July and the other in September. Various exhibits were entered into the record, including a psychological evaluation of respondent, portions of the transcripts from previous proceedings in the same case, records from Chestnut Health Systems, records from the Center for Youth and Family Solutions (CYFS) individual counseling, records from Family Community Resource Center, the initial service plan, and a drug screen summary. The trial court also admitted exhibits regarding

respondent's prior convictions, including a 2008 conviction for unlawful delivery of an alcoholic liquor to a minor (a Class A misdemeanor); a 2009 conviction for aggravated driving under the influence (a Class 4 felony); a 2011 conviction for threatening a public official (a Class 3 felony); a 2013 conviction for domestic battery (a Class A misdemeanor); a 2015 conviction for domestic battery (a Class 4 felony); a 2016 conviction for criminal damage to property (a Class 4 felony); and a 2021 conviction for domestic battery (a Class 4 felony). The convictions were based on respondent's guilty pleas in all cases.

¶ 13 Dr. Tetyana Kostyshyna testified to her education and experience as a licensed clinical psychologist. Without objection, the trial court recognized her as an expert in the field of psychology. She stated that over the course of a two and a half hour, in-person examination of respondent, she conducted an intelligence test called Weschler Adult Intelligence Scale, Fourth Edition; an achievement test for reading called Wide Range Achievement Test, Fifth Edition; a clinical syndromes and personality dysfunction test called Millon Clinical Multiaxial Inventory-IV; and a projective test called the Thematic Apperception Test. Based on the results, she diagnosed respondent with borderline intellectual functioning, alcohol use disorder, cannabis use disorder, and "other specified personality disorder with paranoid and compulsive features." Her psychological diagnosis of respondent was based on the manual of diagnoses Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revised. He has an IQ of 77, with a standard deviation range between 73 and 82; anything above 79 is not statistically concerning. His reasoning ability was, at best, in the sixth percentile, which is the level of a 12-year-old. Based on these diagnoses and findings, Dr. Kostyshyna testified that respondent is capable of making simple decisions but not complex ones. She felt that he is not capable of parenting a child alone because of his borderline intellectual functioning, but he could do so with another person. He is

- 4 -

interpersonally cooperative. She further opined that Daisha could not be the other adult for coparenting purposes due to her emotional dysregulation.

¶ 14　　　　Next, Gage L., respondent's brother, testified regarding a domestic violence incident that occurred in April 2024 at the family's residence. He was awakened one morning by "loud talking," and when he entered the hallway, he saw respondent at the top of the stairs and Daisha at the bottom. He indicated that he "believe[d]" he saw respondent kick Daisha in the head, but he denied seeing him push her down the stairs or out of the residence. Gage L. also denied seeing broken glasses or signs of physical injury to Daisha. He denied a history of physical violence or a high frequency of verbal altercations between respondent and Daisha.

¶ 15　　　　Natasha Bever, a foster care team supervisor with CYFS, testified regarding compliance with the service plan, including services pertaining to cooperation, substance abuse, domestic violence, a psychological assessment, psychiatric services, housing, income, probation, mental health, and parenting. While respondent completed most of these items, he had not completed his psychiatric evaluation. Further, he suffered a relapse in his substance abuse in April, shortly after completing treatment, and he suffered another relapse in October. He denied both instances. He was also involved in domestic violence incidents with Daisha in April and September, after completing the domestic violence course, and he was allegedly involved in other collateral incidents that did not result in the police being called. Respondent denied the April domestic violence incident when questioned about it by police. While respondent's efforts were reported as satisfactory before the domestic violence incident in September, Bever indicated his efforts were unsatisfactory afterwards.

¶ 16　　　　Skyler Hufeld, a case aid who visited with E.L., testified that respondent and Daisha had visitation with E.L. once or twice per week for two to four hours and they acted appropriately

during those visits. E.L. would have "a little moment where he was warming up" but was "pretty happy to see both parents." During visits, they would often put on a movie for background, play with toys, go on walks, and color. He testified that E.L.'s biological parents provided him with food and met his needs. While they occasionally bickered, he felt that it was generally not concerning. Sometimes one parent would be gone for an hour or two during the visit. He indicated that respondent ended a visit approximately 15 minutes early after not being able to get E.L. to stop crying. When confronted with another reported instance of respondent ending a visit early, Hufeld could not recall one way or another.

¶ 17       In her testimony, Daisha admitted to enduring domestic violence from respondent, but she minimized its extent. Regarding the incident in April, she indicated that she has never been kicked in the head and that while respondent put his hands around her neck, it was "[n]ot to strangle" her. Regarding the September incident, she indicated that she had overreacted and that the situation could have been handled without police intervention. When asked about a dog cowering in the corner during the incident, as seen on body-worn police camera video, she said she did not remember that detail.

¶ 18       Daisha further testified that Andrew Stroh, her former caseworker, could have been a better communicator, that she was not informed about visitation switching from twice per month to once per month until very recently, and that the referrals to Chestnut Health Systems occurred only after months of waiting. This testimony conflicted with prior testimony from Bever that Stroh was not a barrier to progress.

¶ 19       Respondent did not offer any testimony or exhibits. The hearing was then adjourned subject to later completion.

¶ 20    When the fitness hearing was reconvened in September, the parties rested without presenting any further evidence and proceeded to make their arguments to the trial court. Before making its determination on fitness, the court noted the evidence during the nine-month period but also specifically said it would consider a few things outside of the applicable nine-month period for the allegations under section 1(D)(m)(ii):

"So the Court would point out that in analyzing this ground, I am considering information only between that nine-month timeframe, or whether one argues that I can state that it reasonably relates to that nine-month timeframe. So, obviously, there are some things that occurred outside February 1 to November 1, such as how we got here, evaluations that were performed that laid the foundation for the services that were necessary. So the Court does consider those things in light of the ground that is alleged in the timeframe that's alleged.

* * *

And I say that because of [Daisha's] testimony in this hearing that while not in the nine-month timeframe, she indicates there's still problems in that household with [respondent's] mom and that existed at the outset of this case. We recognize that it's not healthy, but yet we're still there and haven't addressed that issue in the Court's eyes.

* * *

[T]he Court would note that State's Exhibit 18 are the certified records from [Chestnut Health Systems] which have the history of his substance abuse related issues. Again, some of them predate the timeframe, but it's provided to show the

Court that there is a significant substance abuse issue that we're dealing with. I can't put that in a vacuum and not consider that.

*** 

[W]e have a sample early in the morning that shows present – shows the presence of alcohol, and that's been an issue that's been ongoing throughout the life of this case and especially during the nine-month timeframe."

¶ 21     The trial court ultimately deemed respondent unfit based on his depravity under section 1(D)(i); failure to make reasonable progress between February and November 2024 under section 1(D)(m)(ii); and inability to discharge parental responsibilities under section 1(D)(p).

¶ 22                              D. Best-Interest Hearing

¶ 23     Upon conclusion of the second part of the fitness hearing, the trial court proceeded immediately to the best-interest hearing. Contents of the case file, including the Court Appointed Special Advocate Best Interest Report and the CYFS Best Interest Report, were received into evidence, and the court also heard the testimony of foster mother Dianne G.

¶ 24     Dianne testified that she is E.L.'s maternal grandmother. She and her husband, Rick G., have been married for 33 years. They have cared for E.L. since he was born, and they desire to adopt him even if the State does not provide a subsidy. Rick is a manager, and she works as a server. Their 24-year-old son Sky lives with them and has plans to go to Texas to obtain a master's degree. The foster parents are aged 56 and 60, and neither has serious health issues. Dianne indicated that Sky would be E.L.'s caregiver should something happen to the two of them. She described E.L. as a "ball of joy," smart, happy, observant, kind, caring, talented, and brave. She and E.L. have a bond.

¶ 25        She has not observed E.L.'s interactions with respondent but noted that when visitation is over, E.L. simply says "good-bye" without hugs or kisses. She does not believe the domestic violence issues will improve. She sometimes feels that E.L. does not exist to his biological parents when he is out of their sight. During his second birthday, E.L.'s foster parents took him to Myrtle Beach in Florida. Though there was a hurricane on the east coast that week, E.L.'s parents did not check in on his safety. E.L.'s biological parents also arrived approximately 20 minutes late to his birthday celebration, and the only gift they brought him was a card. Dianne described the encounter as awkward. On another occasion, respondent was in the town where the foster parents live, but they did not reach out to say hi, and only called Dianne to ask for $20 without asking how E.L. was doing. In her opinion, it is in E.L.'s best interest that he be put up for adoption. However, she would not rule out E.L. having contact with his birth parents. She intends to support a relationship between E.L., Daisha, and respondent, even though she does not mention either biological parent to E.L. very often.

¶ 26        Neither respondent nor Daisha offered evidence during the best-interest hearing. At the hearing's conclusion, the trial court determined that it was in E.L.'s best interest that respondent's parental rights be terminated. It then entered an order of termination.

¶ 27        This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29        On appeal, respondent argues that the trial court erred in finding that the State proved him unfit by clear and convincing evidence and that it was in the best interest of the child to terminate his parental rights.

¶ 30        Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights is a two-step process. First, the State must

prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it must then prove by a preponderance of the evidence that termination of parental rights is in the best interest of the children. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 31                                    A. Fitness Determination

¶ 32        Respondent challenges all three grounds relied upon below for the finding of unfitness: depravity under section 1(D)(i) (750 ILCS 50/1(D)(i) (West 2024)); failure "to make reasonable progress toward the return of the child to the parent" during the relevant nine-month period under section 1(D)(m)(ii) (*id.* § 1(D)(m)(ii)); and "[i]nability to discharge parental responsibilities supported by competent evidence" from a qualified professional under section 1(D)(p) (*id.* § 1(D)(p)).

¶ 33        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because its " 'opportunity to view and evaluate the parties *** is superior to that of a reviewing court.' " *In re M.I.*, 2016 IL 120232, ¶ 21 (quoting *In re Brown*, 86 Ill. 2d 147, 152 (1981)). A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when "the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence." *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 89. The court's judgment can be affirmed on any one of the independent grounds supporting the finding of unfitness. See *In re D.F.*, 201 Ill. 2d 476, 505 (2002).

¶ 34        Here, we find that the finding of unfitness can be affirmed on the failure "to make reasonable progress toward the return of the child to the parent" during the relevant nine-month

period under section 1(D)(m)(ii) (750 ILCS 50/1(D)(m)(ii) (West 2024)). The evidence shows that during the relevant time frame, respondent repeatedly relapsed by consuming alcohol, even after treatment; engaged in domestic violence, even after taking the course on domestic violence; and did not take the psychiatric evaluation, despite being diagnosed with a mental impairment. These issues pertained to the service plan and are a sufficient basis for affirming the trial court's finding of unfitness. See *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (emphasizing that reasonable progress can be shown when the parent has *fully* complied with the court's directives and the court can conclude the minor can be returned to the parent in the *near* future) (citing *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)). Furthermore, respondent denied these occurrences in the face of conflicting evidence, and the failure to take responsibility is another sufficient basis for finding lack of reasonable progress. *In re Boolman*, 141 Ill. App. 3d 508, 512 (1986).

¶ 35    Respondent argues the trial court's finding was erroneous because it disregards the evidence pertaining to respondent's substantial compliance with the service plan goals. Relatedly, respondent argues the court failed to account for respondent's actions after his relapses, such as "renewed efforts at sobriety, including new assessments and seeking a sponsor." However, the record also shows respondent did not report the relapses, and some compliance with the service plan does not necessitate a finding of fitness. See *In re F.P.*, 2014 IL App (4th) 140360, ¶¶ 87-88 (holding that the parent's progress must be of "such a quality that the court, *in the near future*, will be able to order the child returned to parental custody") (emphasis in original and internal quotation marks omitted)) (quoting *L.L.S.*, 218 Ill. App. 3d at 461).

¶ 36    Respondent further argues that the trial court improperly considered evidence outside of the nine-month period, and therefore "should get the benefit of having all of his positive efforts outside the nine-month period, including the fact that the trial court was hesitant to initially

find Brice L. unfit, considered as well." The rule as set forth in section 1(D)(m)(ii) is indeed that courts must limit themselves to consideration of events within the specified nine-month period, which, here, is from February to November 2024. We caution the trial court to guard against doing otherwise. However, in this case, we find that the trial court's consideration of a small amount of evidence outside of the nine-month period was harmless. See *In re J.C.*, 2012 IL App (4th) 110861, ¶ 29 ("Errors in the admission of evidence may be deemed harmless where ample evidence supported the court's neglect finding.") (citing *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 15). The evidence at issue was trivial compared to the substantive reasons during the nine-month period that support the finding of unfitness, including the two relapses, the two instances of domestic violence, the denial of these occurrences, and the failure to obtain a psychiatric evaluation. Moreover, the evidence outside of the ninth months largely pertained to the reasons for E.L.'s removal in the first instance, not respondent's compliance with the service plan.

¶ 37    Furthermore, respondent argues the trial court's finding was erroneous because it disregards the challenges he battled with in order to achieve substantial compliance, such as his diagnosis of borderline intellectual functioning. However, this issue was not raised below and is forfeited. See *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 16. Furthermore, respondent does not assert that he ever sought special support based on his mental impairment; that DCFS was required to provide that additional support under state or federal law; or that he did not understand what was being asked of him. On this record, we do not find that DCFS needed to provide additional support or that its failure to do so undermines the propriety of the trial court's ruling. See *id.* ¶¶ 17-19 (rejecting a contention that DCFS's failure to accommodate a parent's disabilities provides a basis for reversal when termination is not based on the disabilities).

¶ 38        The trial court's unfitness finding was not against the manifest weight of the evidence.

¶ 39                              B. Best-Interest Determination

¶ 40        Respondent also argues that the trial court's finding that it was in E.L.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 41        The State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). The trial court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. This is a highly deferential standard of review because "the trial court is in a much better position than is this court to observe the witnesses, assess credibility, and weigh the evidence." *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991). Consequently, we will not substitute our judgment or "overturn the trial court's findings merely because [we] might have reached a different decision." *Id.*

¶ 42        The applicable factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)) are

                "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

                (b) the development of the child's identity;

                (c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."

¶ 43 Respondent argues that the State's argument was "made without referencing a single best interest factor." But the trial court is not obligated to reference specific factors in making its determination. See *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19 ("The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision.").

¶ 44 Further, respondent argues the factors are "inherently skewed against the parents and in favor of terminating parental rights." Respondent's dispute is with the legislature, not the

judiciary. The best-interest determination centers the child's needs, not the needs or wishes of the parent. See *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990) (existence of a father-child bond "does not automatically insure that *** the child's best interests will be served by that parent"); *In re M.C.*, 2018 IL App (4th) 180144, ¶ 30 (" 'In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the biological parents.' " (quoting *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991))); *D.T.*, 212 Ill. 2d at 364 ("[T]he parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). Furthermore, the fact that E.L.'s welfare is known with his foster parents, and unknown with respondent, is enough to affirm. See *In re M.H.*, 2015 IL App (4th) 150397, ¶ 33 ("[T]he foster parent already has established a relationship with [the minor child], and whereas respondent is, in a manner of speaking, an unknown quantity as a parent, the foster parent is a known quantity.").

¶ 45        Respondent reviews all of the statutory factors and notes several which he argues support his contention that it is in E.L.'s best interest to remain his child. However, the existence of some supporting evidence does not require a different outcome. Ample evidence supports the trial court's finding. See *In re Custody of H.J.*, 2021 IL App (4th) 200401, ¶¶ 23-24 (stating, in a case with evidence pointing in both directions, the appellate court would affirm because of the highly deferential manifest weight standard of review); *Tate v. Illinois Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) ("A reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence.") (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 506 (1985)). Specifically, the testimony at the best-interest hearing shows E.L.'s foster parents—his biological grandparents—have provided him with a consistent, stable, and safe environment. He expressed

comfort with his placement and an emotional connection with his foster parents, who have expressed their love for him and a willingness to adopt even without subsidies from the State. On the contrary, and without any challenge from respondent, the evidence shows E.L. at times had awkward interactions with respondent, did not show affection during goodbyes, and did not show interest. In some instances, respondent showed up late, left early, and did not inquire about E.L. Their home life is made precarious by domestic violence and substance abuse.

¶ 46    Accordingly, the trial court's best-interest determination was not against the manifest weight of the evidence.

¶ 47                                    III. CONCLUSION

¶ 48    For the reasons stated, we affirm the trial court's judgment.

¶ 49    Affirmed.